## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA
## PANAMA CITY DIVISION

**MANIKA LEWIS,**

     **Plaintiff,**

**v.**                       **CASE NO.  5:18-cv-00263-MCR/MJF**

**HEATHER WILSON, Secretary**
**of the Department of the United**
**States Air Force,**

     **Defendant.**

_____/

## PLAINTIFF'S RESPONSE AND MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Plaintiff, through her counsel, files this response in opposition to Defendant's Motion for Summary Judgment as follows:

## I. STATEMENT OF FACTS

Defendant hired Plaintiff, a black female, aged 49, as a civilian mammographer at Eglin Air Force Base in June, 2002. [Ex. 1, Pltf. Aff., ¶ 1-2]. In 2004, Plaintiff was promoted to Chief of the mammography department, but in 2010, Defendant decided to replace all civilian heads of department with enlisted personnel, and therefore, Plaintiff lost the title of "Chief" and lost supervisory duties, but retained all duties as a mammographer. [Ex. 1, Pltf. Aff., ¶ 3; Ex. 2, Pltf. Dep., p. 5-6, 15]. As a result of her demotion from Chief, Plaintiff filed a complaint with

Defendant's Equal Employment Opportunity office ("EEO"). [Ex. 1, Pltf. Aff., ¶ 4; Ex. 2, Pltf. Dep., p. 5-6, 13, 15].

Plaintiff holds an Associate's of Science degree and a Bachelor's of Science degree in radiology, and has held active licenses in both radiology and mammography since around 2000. [Ex. 1, Pltf. Aff., ¶ 5; Ex. 2, Pltf. Dep., p. 135-136].

In December, 2015, Plaintiff attended a meeting of the radiology department in which management employees, including Master Sergeant Jesse Thomas, Plaintiff's second line supervisor, labeled Plaintiff as the "problem child" of the radiology department and told Plaintiff that no one in the radiology department liked her. [Ex. 1, Pltf. Aff., ¶ 6; Ex. 2, Pltf. Dep., p. 32-33]. Plaintiff reported the meeting through the EEO office, stating that she was treated differently than her coworkers. [Ex. 1, Pltf. Aff., ¶ 7; Ex. 2, Pltf. Dep., p. 27-32].

Plaintiff was the only black federal employee in the mammography department, and the oldest employee in the department. [Ex. 1, Pltf. Aff., ¶ 8; Ex. 2, Pltf. Dep., p. 33].

In early 2016, Staff Sergeant Hannah Davis, white and 20 years Plaintiff's junior, was assigned to the mammography department. [Ex. 1, Pltf. Aff., ¶ 9]. Prior to Davis' assignment to the mammography department, Plaintiff received stellar evaluations and was awarded Civilian of the Quarter in 2015 and again in 2016. [Ex.

1, Pltf. Aff., ¶ 10; Ex. 3, Evaluations].

On April 21, 2016, Davis ordered Plaintiff to verify quality control ("qc") documentation for which Plaintiff did not personally perform the necessary tests in expectation of an FDA accreditation audit. [Ex. 1, Pltf. Aff., ¶ 11; Ex. 2, Pltf. Dep., p. 58-59; Ex. 5, Memorandum]. When Plaintiff explained that verifying qc records for tests that she did not personally perform was a violation of policy, Davis yelled at Plaintiff in front of coworkers that she was "trying to save Plaintiff's job," which Plaintiff interpreted as a threat to her job. [Ex. 1, Pltf. Aff., ¶ 11; Ex. 2, Pltf. Dep., p. 58-59; Ex. 5, Memorandum].

In May, 2016, Plaintiff received an evaluation which was scored far lower than normal, and when she challenged the scores, her supervisor, Master Sergeant Gladle, an ultrasound technician who had no personal observation of Plaintiff's work performance in mammography, told her that she based the scores on comments from Staff Sergeant Davis, newly assigned to the mammography department who had no experience with or certification in mammography. [Ex. 1, Pltf. Aff., ¶ 12; Ex. 2, Pltf. Dep., p. 229-230; Ex. 6, Initial Contact EEO, 6/28/16]. Plaintiff filed a union grievance about Davis creating a hostile work environment, and Plaintiff filed an EEO complaint about the evaluation. [Ex. 1, Pltf. Aff., ¶ 13; Ex. 2, Pltf. Dep., p. 27-32, 43-45].

Master Sergeant Person, flight chief for the radiology department, named Staff

Sergeant Hannah Davis as the department head for mammography, although Davis did not have a mammography license or any mammography training. [Ex. 7, Person's Dep., p. 9-10]. In fact, Davis has never held a mammography license and only attended a two (2) week training session in performing mammograms which is offered by the military. [Ex. 8, Davis' Dep., p. 7-8, 11].

From the time that Davis became department head for mammography, she treated Plaintiff differently than Plaintiff's younger white coworkers, including following Plaintiff around the department and yelling at Plaintiff in front of coworkers and patients alike. [Ex. 1, Pltf. Aff., ¶ 14; Ex. 2, Pltf. Dep., p. 58-59]. In addition, Davis invaded Plaintiff's personal space, getting in Plaintiff's face to continue the verbal abuse. [Ex. 1, Pltf. Aff., ¶ 15; Ex. 2, Pltf. Dep., p. 58-59].

Plaintiff complained to Davis' immediate supervisor, Master Sergeant Thomas, and to Davis' second line supervisor, Master Sergeant Person, about Davis invading her personal space, but nothing was done to curtail the behavior; instead, Davis escalated the verbal abuse and physical intimidation of Plaintiff. [Ex. 1, Pltf. Aff., ¶ 16; Ex. 7, Person's Dep., p. 19; Ex. 8, Davis' Dep., p. 15-17; Ex. 14, Transcript, 8/29/17, p. 130-148; Ex. 38, Decision, 12/15/17, p. 11]. Plaintiff also went to base security with Davis following her and yelling at her, but security would not discipline Davis because she did not physically touch Plaintiff during the altercation. [Ex. 1, Pltf. Aff., ¶ 17]. In addition, on or about May 3, 2016, Plaintiff

4

filed a union grievance stating that she was subjected to a hostile work environment because of Davis' treatment of her. [Ex. 1, Pltf. Aff., ¶ 18].

While Plaintiff's coworkers witnessed Davis' verbal abuse of Plaintiff while she chased her around the department, the younger white coworkers refused to report the treatment, and instead, they snickered at Plaintiff behind Davis' back. [Ex. 1, Pltf. Aff., ¶ 19]. Davis also used racially charged language when accusing Plaintiff of disrespectful behavior, telling Plaintiff that "her people" spoke rudely. [Ex. 1, Pltf. Aff., ¶ 20].

On or about May 17, 2016, Plaintiff was subjected to additional verbal abuse by Davis who demanded a doctor's note for Plaintiff's use of sick leave on May 10 and 11, 2016; no other employee was required to provide a doctor's note for 2 days of sick leave. [Ex. 1, Pltf. Aff., ¶ 21; Ex. 2, Pltf. Dep., p. 72-73].

On or about June 14 and June 21, 2016, Plaintiff was accused of not performing her job duties and/or misplacing patient information, although Plaintiff denies failing to perform duties, including quality control checks of the equipment and misplacing a patient's CD with imaging. [Ex. 1, Pltf. Aff., ¶ 22; Ex. 2, Pltf. Dep., p. 93-101, 120-121].

On July 8, 2016, Davis attempted to issue Plaintiff discipline for failing to use a sign in/out board in the department while Plaintiff attended a meeting with her union representative, and her immediate supervisor, Master Sergeant Gladle

scheduled the meeting and informed Plaintiff of the date and time. [Ex. 1, Pltf. Aff., ¶ 23; Ex. 2, Pltf. Dep., p. 129-132; Ex. 9, Memorandum, 7/8/16]. During the meeting, Master Sergeant Person, Davis' supervisor, called Plaintiff and proceeded to verbally abuse her over the telephone, threatening to make Davis Plaintiff's immediate supervisor in spite of the conflict which had occurred between them. [Ex. 1, Pltf. Aff., ¶ 24; Ex. 2, Pltf. Dep., p. 129-132; Ex. 7, Person's Dep., p. 33-40; Ex. _, Cooper's Dep., p. 64-66].

Union employees, including Plaintiff, were not required to utilize a sign in/out board in their respective departments until September 23, 2016, and in fact, the mammography department was the only one to use such a board, and Plaintiff was the only union employee in the entire hospital subject to the rule. [Ex. 1, Pltf. Aff., ¶ 25; Ex. 10, Cooper's Dep., p. 10-14, 64-66; Ex. 11, Email, 7/19/l6; Ex. 12, Memorandum, 9/23/16]. After September 23, 2016, when it became mandatory, Plaintiff regularly used the sign in/out board, as ordered. [Ex. 1, Pltf. Aff., ¶ 26]. However, the board was a dry erase board located in a high traffic area of the department, and on multiple occasions, Plaintiff witnessed her time erased from the board without her authorization. [Ex. 1, Pltf. Aff., ¶ 26]. During her employment with Defendant, Plaintiff always maintained her schedule electronically on a calendar shared by all employees of the mammography department. [Ex. 1, Pltf. Aff., ¶ 27].

6

On August 10, 2016, true to his word, Master Sergeant Person named Davis, white and twenty (20) years Plaintiff's junior, as Plaintiff's direct supervisor. [Ex. 1, Pltf. Aff., ¶ 28]. Plaintiff contacted the EEO department on August 12, 2016 about Davis' appointment as her supervisor. [Ex. 1, Pltf. Aff., ¶ 29; Ex. 2, Pltf. Dep., p. 231; Ex. 13, EEO Initial Contact, 8/12/16]. Master Sergeant Person testified that Plaintiff was the only employee to file a grievance against him in the three (3) years that he supervised the department. [Ex. 14, Transcript, 8/29/17, p. 128].

Despite the fact that the board issue was not resolved until September 23, 2016, Davis issued Plaintiff an oral admonishment about the board on August 30, 2016, for Plaintiff's failure to use the board on several instances in August, 2016. [Ex. 1, Pltf. Aff., ¶ 30; Ex. 2, Pltf. Dep., p. 243-244; Ex. 15, Memorandum, 8/29/16].

On August 31, 2016, Davis issued Plaintiff additional discipline for disrespectful behavior during the meeting on August 30, 2016, in which Davis accused Plaintiff of yelling at her and speaking with a disrespectful tone, although there was no witness to the meeting between the two (2) individuals. [Ex. 1, Pltf. Aff., ¶ 31; Ex. 2, Pltf. Dep., p. 254-256; Ex. 16, Memorandum, 8/31/16]. At no time during her employment with Defendant did Plaintiff raise her voice at Davis or at any other supervisor, neither did Plaintiff address any supervisor, including Davis, with a disrespectful tone. [Ex. 1, Pltf. Aff., ¶ 32]. In fact, during the August 30 and 31, 2016 meetings, in which Davis accused Plaintiff of being belligerent and

7

disrespectful and with no other witnesses to the meetings, Davis did not even allow Plaintiff to speak. [Ex. 1, Pltf. Aff., ¶ 33]. When Plaintiff attempted to speak, Davis immediately cut Plaintiff off each time to continue her abusive diatribes against Plaintiff. [Ex. 1, Pltf. Aff., ¶ 33].

In addition, Davis had Plaintiff's time cards altered for multiple pay periods in August and September, 2016, accusing Plaintiff of being AWOL because of Plaintiff's failure to use the board, although it was not mandated for Plaintiff until September 23, 2016, causing Plaintiff to lose money, and neither Davis nor any other employee told Plaintiff of the alterations, against Defendant's policy. [Ex. 1, Pltf. Aff., ¶ 34; Ex. 2, Pltf. Dep., p. 312-314; Ex. 8, Davis' Dep., p. 72-75; Ex. 17, Civilian Leave and Earnings Statements; Ex. 12, Memorandum, 9/23/16].

Plaintiff filed an EEO pre-complaint about the treatment she received from Davis, including the May, 2016 evaluation, the July, 2016 discipline, as well as the August, 2016 events, on August 31, 2016. [Ex. 1, Pltf. Aff., ¶ 35; Ex. 2, Pltf. Dep., p. 23-25; Ex. 18, EEO Counselor's Report].

Prior to Davis becoming Plaintiff's supervisor, employees of the mammography department took a one (1) hour lunch period, rather than 2 fifteen (15) minute breaks and a thirty (30) minute lunch, in order to accommodate patient scheduling, and Plaintiff continued to use this practice until Davis ordered the mammographers not to take a one (1) hour lunch break on or about September 27,

2016. [Ex. 1, Pltf. Aff., ¶ 36; Ex. 2, Pltf. Dep., p. 312-313; Ex. 19, Email, 9/23/16; Ex. 20, Email, 9/27/16]. In fact, Davis also removed the two (2) fifteen (15) minute breaks, claiming that the mammographers had enough "downtime" between patients to constitute a break. [Ex. 1, Pltf. Aff., ¶ 37; Ex. 20, Email, 9/27/16]. At no time after Davis ordered mammographers to utilize a thirty (30) minute lunch break did Plaintiff take additional unauthorized time for breaks. [Ex. 1, Pltf. Aff., ¶ 38]. While Plaintiff did not take breaks, Plaintiff witnessed her coworkers, younger than her and white, taking breaks that Plaintiff could not. [Ex. 1, Pltf. Aff., ¶ 39].

After Plaintiff filed her EEO complaint, Davis filed a notice of proposed reprimand on October 5, 2016 for the alleged incidents that occurred on August 30 and 31, 2016, as well as for Plaintiff's failure to use the board in August, 2016 and for Plaintiff's use of one (1) hour lunch breaks in August, 2016, although those issues were not resolved by the union until September, 2016. [Ex. 1, Pltf. Aff., ¶ 40; Ex. 21, Notice of Proposed Discipline, 10/5/16]. The proposed reprimand was duplicative of discipline Davis had already issued to Plaintiff in August, 2016. [Ex. 1, Pltf. Aff., ¶ 40; Ex. 21, Notice of Proposed Discipline, 10/5/16].

No other employee in the hospital was disciplined for failing to use a sign in/out board. [Ex. 1, Pltf. Aff., ¶ 41; Ex. 11, Email, 7/19/16].

On October 21, 2016, Plaintiff filed a formal EEO Complaint. [Ex. 1, Pltf. Aff., ¶ 42; Ex. 22, EEO COD (A)].

On October 26, 2016, Davis refused to provide authorization on a mandatory form to document time, insisting instead that Plaintiff merely use the sign in/out board; when Plaintiff continued to explain that the form was mandatory, Davis escalated the issue, demanding that Plaintiff only use the board and refusing to provide instruction as to who would sign the mandatory form. [Ex. 1, Pltf. Aff., ¶ 43; Ex. 2, Pltf. Dep., p. 256-262]. While Davis refused to sign the mandatory form, Plaintiff did record her time on the sign in/out board on October 26, 2016. [Ex. 1, Pltf. Aff., ¶ 43; Ex. 23, Photograph]. While Davis raised her voice at Plaintiff during the encounter, at no time did Plaintiff yell at or speak disrespectfully to Davis. [Ex. 1, Pltf. Aff., ¶ 44].

On October 31, 2016, Davis issued Plaintiff an evaluation which rated Plaintiff as "needs significant improvement," on most of the elements of the evaluation and below average on all elements, but Davis failed to provide Plaintiff with an explanation as to why she was rated so poorly, offer instructions on how to improve her performance, or place Plaintiff on a performance improvement plan, as required by Defendant's policy. [Ex. 1, Pltf. Aff., ¶ 45; Ex. 2, Pltf. Dep., p. 187-188, 190-191, 195-196; Ex. 24, Civilian Progress Review Worksheet, 10/31/16]. Davis also did not inform Plaintiff of which job duties she could continue to perform or which job duties were suspended pending such a performance improvement plan. [Ex. 1, Pltf. Aff., ¶ 45].

Immediately after receiving the evaluation, Plaintiff filed a grievance with the union, and the union asked for clarification from Defendant as to what tasks Plaintiff was allowed to perform, based on the poor evaluation because Defendant's policy states that anyone issued an evaluation wherein the employee is rated as needs significant improvement is required to be placed on a performance improvement plan. [Ex. 1, Pltf. Aff., ¶ 46; Ex. 2, Pltf. Dep., p. 187-188, 190-191, 195-196; Ex. 10, Cooper's Dep., p. 21-25].

On November 15 and 18, 2016, Plaintiff emailed Davis that she required clarification of her duties in regard to an independent stereotactic breast biopsy scheduled for November 23, 2016 because no agent for Defendant had provided clarification of the evaluation Davis issued to Plaintiff on October 31, 2016. [Ex. 1, Pltf. Aff., ¶ 47; Ex. 2, Pltf. Dep., p. 187-188, 190-191, 195-196; Ex. 10, Cooper's Dep., p. 21-25; Ex. 25, Email, 11/15/16]. At no time did Plaintiff refuse to perform the procedure. [Ex. 1, Pltf. Aff., ¶ 48]. Plaintiff requested clarification of her performance deficiencies and what job duties Plaintiff was authorized to perform based on the evaluation, but Davis failed to provide Plaintiff with any of the requested information. [Ex. 1, Pltf. Aff., ¶ 48; Ex. 25, Email, 11/15/16]. Defendant has an operating instruction which states that any practitioner can refuse to perform a procedure for ethical reasons. [Ex. 26, 96th Medical Group Instruction 41-205, 5.3].

On December 16, 2016, Master Sergeant Thomas finally responded to the

union that Plaintiff could perform all duties contained within her job description; Thomas also informed the union that the October 31, 2016 evaluation would be removed from Plaintiff's personnel file and that Davis would discuss Plaintiff's performance and tell Plaintiff what she needed to do to improve any deficiencies. [Ex. 1, Pltf. Aff., ¶ 49; Ex. 10, Cooper's Dep., p. 21-25; Ex. 27, Email, 12/16/17]. Davis met with Plaintiff in Plaintiff's union representative's office to discuss the evaluation form, and Alan Cooper, Plaintiff's union representative, testified that Davis subjected Plaintiff to a litany of verbal abuse when she believed she was alone with Plaintiff. [Ex. 10, Cooper's Dep., p. 19-21, 28].

On January 4, 2017, Davis issued Plaintiff a notice of proposed suspension based on incidents which occurred in October and November, 2016, including Plaintiff's alleged refusal to perform the stereotactic biopsy without clarification of her allowed job duties; Davis' notice was more than 45 days from the dates of the alleged incidents, and therefore, outside the timeframe of proposed discipline. [Ex. 1, Pltf. Aff., ¶ 51; Ex. 8, Davis' Dep., p. 75-76; Ex. 28, Master Labor Agreement, 5.01(b); Ex. 45, Memorandum, 1/4/17].

Thereafter, in January, 2017, Davis reported Plaintiff to privacy officer Humphries for emailing protected health information to her union representative. [Ex. 1, Pltf. Aff., ¶ 52; Ex. 8, Davis' Dep., p. 55-56; Ex. 29, Humphries' Dep., p. 15]. Under DOD regulations, disclosure of personal health information is allowed for

health care operations to include resolution of internal grievances. [Ex. 30, DOD 6025-18R(4)(b)(5)]. In emailing the information to her union representative, Plaintiff encrypted the information. [Ex. 1, Pltf. Aff., ¶ 53]. Thereafter, Davis sent an email to Plaintiff containing unencrypted private health information in violation of Defendant's policies. [Ex. 1, Pltf. Aff., ¶ 54; Ex. 2, Pltf. Dep., p. 160-161; Ex. 29, Humphries' Dep., p. 25-26]. On January 31, 2017, privacy officer Humphries emailed Plaintiff that her explanation regarding disclosing the information to her union representative was insufficient and that he required a statement that she would forward all such communications through him or through the legal office prior to sending it to her union representative in the future. [Ex. 31, Email, 1/31/17]. Plaintiff provided a statement that she would abide by all privacy rules and regulations on January 31, 2017. [Ex. 1, Pltf. Aff., ¶ 56; Ex. 31, Email, 1/31/17]. On February 1, 2017, while Plaintiff was away for training, Humphries again notified her by email that her statement was insufficient, and then he provided her with the exact wording he required of her. [Ex. 1, Pltf. Aff., ¶ 57; Ex. 31, Email, 2/1/17]. After returning from her training session on February 14, 2017, Plaintiff learned that her access to Patient Health Information (PHI) and Patient Insurance Information (PII) was suspended because of Humphries' dissatisfaction with her initial response, and Plaintiff immediately provided a second response which quoted Humphries February 1, 2017 email word for word. [Ex. 1, Pltf. Aff., ¶ 58; Ex. 29, Humphries'

Dep., 36-37; Ex. 31, Email, 2/14/17; Ex. 32, Memorandum, 2/9/17]. Once again, Humphries determined that Plaintiff's response was insufficient because she included the words "I need you to state," prior to quoting exactly what Humphries wanted her to write. [Ex. 29, Humphries' Dep., p. 36-37, 43; Ex. 31, Email, 2/14/17]. Plaintiff's access to PHI and PII was not restored even after Plaintiff complied with Humphries' demand. [Ex. 1, Pltf. Aff., ¶ 60].

In addition to complying with Humphries' demand for a statement, Plaintiff completed remedial training on HIPAA compliance. [Ex. 1, Pltf. Aff., ¶ 61; Ex. 29, Humphries' Dep., p. 19, 31]. Humphries testified that HIPAA violations at the facility occur regularly and that the usual requirement for violators is to complete remedial training. [Ex. 29, Humphries' Dep., p. 17-18]. Although Davis violated the privacy rules and regulations by sending unencrypted emails with private health information, Davis suffered no disciplinary action, and was not even required to complete remedial training. [Ex. 29, Humphries' Dep., p. 25-28; Ex. 8, Davis' Dep., p. 16-17].

Thereafter, Plaintiff amended her EEO complaint to include the privacy matter and to include Humphries as a respondent. [Ex. 1, Pltf. Aff., ¶ 62; Ex. 29, Humphries' Dep., p. 24-25].

On February 14, 2017, Defendant suspended Plaintiff from all patient care and reassigned Plaintiff to perform administrative tasks, based on Davis' recommended

14

discipline filed after the 45-day deadline. [Ex. 1, Pltf. Aff., ¶ 63; Ex. 33, Memorandum, 2/14/17]. Because Plaintiff's licenses require that she perform a set number of procedures each year, Defendant's actions jeopardized Plaintiff's ability to hold the active licenses. [Ex. 1, Pltf. Aff., ¶ 64; Ex. 2, Pltf. Dep., p. 331-332]. In removing Plaintiff from patient care, Defendant's agents accused Plaintiff of refusing to perform multiple procedures, although Plaintiff was only suspended for the November 23, 2016 procedure which Plaintiff did not refuse to perform, but rather, requested clarification on her ability to perform. [Ex. 1, Pltf. Aff., ¶ 65; Ex. 33, Memorandum, 2/14/17].

Plaintiff did not meet with Colonel Ives on February 13, 2017. [Ex. 1, Pltf. Aff., ¶ 66]. Plaintiff was on leave for training. [Id.]. Plaintiff did meet with Colonel Ives and her union representative, Alan Cooper, after February 14, 2017, when Plaintiff returned from leave. [Id.]. However, Colonel Ives merely laughed at the allegations in Plaintiff's grievance and stated that he did not believe Davis treat Plaintiff in the way Plaintiff described in the grievance. [Id.]. The meeting ended after Colonel Ives' statement, and Plaintiff was not interviewed further in regard to the grievance. [Id.].

In addition, Defendant's agents subjected Plaintiff to a quality assurance investigation, and permanently removed her from patient care as a result of the investigation's findings. [Ex. 1, Pltf. Aff., ¶ 67; Ex. 34, Quality Assurance

Investigation, 4/25/17; Ex. 35, Memorandum, 8/2/17]. Included in the investigation's findings were statements and accusations for which Plaintiff was never informed, never received discipline and for which Plaintiff denies any misconduct, disrespect or insubordination. [Ex. 1, Pltf. Aff., ¶ 68; Ex. 36, Pltf. Letter, 7/12/17]. Moreover, the investigator attempted to interview Plaintiff while Plaintiff was serving the suspension and not on base, and when Plaintiff returned from the suspension, the investigator refused to allow her a union representative for the interview; when the investigator finally recognized Plaintiff's right to have a union representative present, the investigator refused to cooperate with the representative to schedule the interview and therefore, the investigator never actually interviewed Plaintiff prior to rendering her findings. [Ex. 1, Pltf. Aff., ¶ 69]. A peer review conducted after the quality assurance investigation rendered findings based solely on the quality assurance investigations findings, and did no independent investigation. [Ex. 37, Memorandum, 5/24/17].

On August 29, 2017, a hearing was held about my grievance regarding Davis creating a hostile work environment and about Master Sergeant Person attempting to meet with me about the grievance without union representation being present. [Ex. 1, Pltf. Aff., ¶ 70]. Master Sergeant Person made conflicting statements and offered contradictory evidence. [Ex. 1, Pltf. Aff., ¶ 70; Ex. 14, Transcript, 8/29/17, p. 130-148; Ex. 38, Decision, 12/15/17, p. 10-11]. Ultimately, Judge Welch determined that

Master Sergeant Person did commit unfair labor practices when he attempted to meet with Plaintiff in May and June, 2016 about Davis' abusive treatment of Plaintiff without allowing Plaintiff's union representative to be present. [Ex. 1, Pltf. Aff., ¶ 70; Ex. 38, Decision, 12/15/17, p. 11-12]. In addition to subjecting Plaintiff to a quality assurance investigation, Defendant's agents reported Plaintiff to the licensing agency for ethics violations stemming from the November 23, 2016 stereotactic procedure. [Ex. 1, Pltf. Aff., ¶ 71]. After requesting supporting documentation from Plaintiff while Plaintiff was renewing her licenses, the licensing agency, American Registry of Radiologic Technologists ("ARRT"), determined that Plaintiff did not commit any ethics violations and renewed Plaintiff's licenses. [Ex. 1, Pltf. Aff., ¶ 71]. Both Plaintiff's radiology license and mammography license remain current. [Ex. 1, Pltf. Aff., ¶ 72].

Plaintiff accepted a position as a mammography technician with the Navy, and thereafter, Plaintiff's immediate supervisor told Plaintiff that the human resources department received Plaintiff's disciplinary history, as well as Plaintiff's history of filing complaints and grievances, from Defendant's agents. [Ex. 1, Pltf. Aff., ¶ 73].

At no time during her employment with Defendant did Plaintiff refuse to answer questions directed at her by a doctor, a supervisor or a coworker. [Ex. 1, Pltf. Aff., ¶ 74]. At no time during her employment with Defendant did Plaintiff refuse to cooperate with any investigation conducted by any agent of Defendant. [Ex. 1, Pltf.

Aff., ¶ 75]. At no time during her employment with Defendant did Plaintiff ever refuse to perform a procedure for which she was qualified and authorized. [Ex. 1, Pltf. Aff., ¶ 76]. At no time during her employment with Defendant was Plaintiff intentionally insubordinate to a supervisor or refuse a supervisor's authorized order. [Ex. 1, Pltf. Aff., ¶ 77].

Davis' untimely recommended discipline was upheld in March, 2017, and Plaintiff served a ten (10) day suspension. [Ex. 1, Pltf. Aff., ¶ 78; Ex. 39, Memorandum, 3/13/17].

Because Plaintiff could no longer perform mammograms, putting Plaintiff's active licenses in jeopardy, Plaintiff had no choice but to seek other employment. [Ex. 1, Pltf. Aff., ¶ 79].

While Colonel Alder claimed that accusations rendered against Plaintiff were substantiated by other supervisors than Davis, no other supervisor testified that they had personal knowledge of the incidents for which Davis issued Plaintiff discipline. [Ex. 40, Alder's Dep., p. 18-22; Ex. 41, Ives' Dep., p. 4-5; Ex. 7, Person's Dep., p. 14; Ex. 42, Super's Dep., p. 6]. In upholding Davis' recommended discipline, including written reprimands, suspension and removal from patient care, no supervisor completed an independent investigation, but instead, relied on Davis' accounts of the incidents. [Ex. 1, Pltf. Aff., ¶ 80; Ex. 40, Alder's Dep., p. 15, 18-19, 21-23, 26-29, 31; Ex. 41, Ives' Dep., p. 4-5; Ex. 7, Person's Dep., p. 32-37, 47-49,

53-56; Ex. 42, Super's Dep., p. 6, 21-22, 26-30, 35-37, 42, 63-64]. Moreover, Plaintiff's former coworker, Diana Cobo testified that she never saw Plaintiff do anything that fell below the standard of patient care, was unaware of any issues with Plaintiff, never filed a complaint or made any negative report about Plaintiff. [Ex. 43, Cobo's Dep., p. 9-12].

Plaintiff was ultimately replaced by Jennifer Newland, Plaintiff's coworker who previously held a contract position as a mammography technician as opposed to Plaintiff's full-time position with Defendant; Newland is white and younger than Plaintiff. [Ex. 1, Pltf. Aff., ¶ 81; Ex. 44, Newland's Dep., p. 3-4, 7]. Newland testified that she did not file any complaints about Plaintiff, but she did provide information to Davis about Plaintiff. [Ex. 44, Newland's Dep., p. 7-8].

As a result of the stress Plaintiff experienced from Davis' abusive, threatening, differential and harassing treatment, Plaintiff suffered sleeplessness for which Plaintiff required prescription medication. [Ex. 1, Pltf. Aff., ¶ 82]. After being out sick on multiple occasions in 2016, Defendant's agents ordered Plaintiff to see a psychiatrist for a mental health evaluation, and Plaintiff now suffers from high blood pressure which also requires medication; Plaintiff previously had low blood pressure, and Plaintiff's doctor attributed the new diagnosis to work related stress. [Ex. 1, Pltf. Aff., ¶ 82].

## II.  STANDARD FOR SUMMARY JUDGMENT

A plaintiff will always survive summary judgment if she presents circumstantial evidence that creates a triable issue concerning the employer's discriminatory intent. <u>Smith v. Lockheed-Martin Corporation</u>, 644 F.3d 1321, 1328 (11th Cir. 2011).

### III. <u>RACE DISCRIMINATION</u>

Defendant analyzes Plaintiff's *prima facie* case under the <u>McDonnell Douglas</u> standards, claiming that Plaintiff cannot identify comparators. However, Plaintiff is not pigeon holed into a strict format in which to present her case. <u>See</u> <u>Lockheed-Martin</u>, 644 F.3d at 1328. But even under <u>McDonnell</u>, the shifting burdens are not intended to create substantial intermediate barriers, but are "meant only to aid courts and litigants in arranging the presentation of evidence." <u>Watson v. Fort Worth Bank and Trust</u>, 487 U.S. 977, 986 (1988). The Supreme Court has repeatedly emphasized that the plaintiff's initial burden of proving a *prima facie* case is "not onerous." <u>Patterson v. McLean Credit Union</u>, 491 U.S. 164, 186 (1989); <u>Watson</u>, 487 U.S. at 986; <u>Texas Dept. of Community Affairs v. Burdine</u>, 450 U.S. 248, 253 (1981).

Even though Plaintiff is not required to show comparators, she can identify similarly situated individuals, primarily in the mammography department, who are all white and younger than Plaintiff, including Davis, herself. No other mammography technician was subjected to verbal berating, refusal of time off without a doctor's note, lowered evaluations, discipline and hostile and aggressive

20

treatment to which Plaintiff was subjected. In fact, no other employee in the entire hospital was subjected to discipline for failing to use a sign in/out board, like Plaintiff was.

The Eleventh Circuit has alternatively used the standards of "similarly situated" and "nearly identical" when identifying comparators.  Compare Alexander v. Fulton County, Ga., 207 F. 3d 1303, 1334 (11th Cir. 2000) (requiring "similar misconduct from the similarly situated comparator") with Burke- Fowler v. Orange Co., 447 F. 3d 1319, 1323, n.2 (11th Cir. 2006)(affirming the "nearly identical" standard).  But, "'nearly identical,' does not mean 'exactly identical.'" McCann v. Tillman, 526 F.3d 1370, 1374 (11th Cir. 2008) (noting that a range of comparators may suffice).   Plaintiff argues that other employees of Defendant are proper comparators. Defendant allowed Davis to harass, verbally abuse and discriminate against Plaintiff unchecked. No administrator even investigated Plaintiff's complaints when she provided them to her supervisory chain of command. Instead, they took Davis at her word that Plaintiff was belligerent, disrespectful or argumentative to her supervisor, and allowed Davis to discipline Plaintiff for the alleged conduct, although there were no witnesses. Meanwhile, Davis verbally abused Plaintiff, infringed on her personal space to physically intimidate her, yelled and screamed at her before coworkers and patients, behavior for which Davis received no consequences, despite Plaintiff's complaints to Davis' supervisors.

Moreover, Plaintiff can identify additional evidence that she was the victim of discrimination. Davis made racial comments about Plaintiff's "people," suggesting that all black people are rude. Davis refused to provide feedback or clarification on Plaintiff's evaluations that were ultimately removed from Plaintiff's personnel file and redone. Davis refused to provide information on which duties Plaintiff was allowed to perform, although she scheduled Plaintiff to perform an independent stereotactic procedure, setting Plaintiff up for additional discipline. Then, Davis proposed discipline outside the 45-day deadline. Supervisors ignored Davis' faulty proposed discipline, and ultimately upheld the suspension, removed Plaintiff from patient care and subjected her to a QA investigation. The investigation, itself, was flawed and cited incidents that allegedly occurred years before, but Plaintiff had no information about such incidents. No one discussed them with Plaintiff at the time they occurred, if they ever occurred. There was no documentation for the incidents in Plaintiff's personnel file and she was never issued discipline for the incidents and they were not on her evaluations. Furthermore, the investigator refused to cooperate with Plaintiff's union representative to interview Plaintiff and never actually spoke with Plaintiff prior to rendering her findings.

Further, the final inquiry is whether or not the employees were subjected to different policies or discipline. See id.; see also, McDonald v. Santa Fe Trail Transportation Co., 427 U.S. 273, 283 n.11 (1976) (disparate treatment for

22

employees accused of acts of comparable seriousness may demonstrate pretext). The inquiry into whether comparators are similarly situated "is flexible, common-sense, and factual. It asks 'essentially, are there enough common features between the individuals to allow a meaningful comparison?'" Coleman v. Donahoe, 667 F.3d 835, 840 (7th Cir. 2012) (quoting Humphries v. CBOCS West, Inc., 474 F.3d 387, 405 (7th Cir. 2007)). This is "'usually a question for the fact-finder,' and summary judgment is appropriate only when 'no reasonable fact-finder could find that plaintiffs have met their burden on the issue.'" Coleman at 846-47; Jones v. UPS Ground Freight, 683 F.3d 1283, 1292 (11th Cir. 2012) ("We may not weigh conflicting evidence or make credibility determination of our own.  If the record presents disputed issues of fact, the court may not decide them; rather, [we] must deny the motion and proceed to trial.")(citations omitted)).

Here, from the time that Davis was assigned to the mammography department, she subjected Plaintiff to differential treatment, as compared to the other employees of the department, all of whom were white. Davis yelled at Plaintiff in front of her coworkers and patients, causing Plaintiff's coworkers to snicker at Plaintiff; Davis followed Plaintiff around the department, invading her personal space to physically intimidate her. Davis subjected her to terrible evaluations, although Davis, herself, had no experience or certification to perform mammograms, and had only worked in mammography for a couple months prior to the May, 2016 evaluation for which

she provided Plaintiff's supervisor with all information, and had supervised Plaintiff less than 3 months before issuing the October, 2016 evaluation. Davis provided no feedback as to what Plaintiff actually did wrong or how she could improve her performance, leaving Plaintiff open to further discipline or continued poor evaluations. When Plaintiff and her union representative asked for clarification, Davis and other supervisors refused to provide it. Instead, Davis assigned Plaintiff to perform a stereotactic biopsy by herself, leaving Plaintiff open to additional discipline, if Davis determined that her performance was inadequate per the evaluation, or as happened, discipline for Plaintiff's request that another technician be assigned to the procedure because she was not comfortable performing it by herself without clarification of her performance deficiencies. Defendant has an operational instruction that allows practitioners to refuse a procedure for ethical reasons, as Plaintiff did, concerned about the performance deficiencies affecting patients without additional information. The incident occurred November 18, 2016, and yet, on January 4, 2017, Davis took it upon herself to recommend Plaintiff's suspension based on the November 18 incident, as well as an October incident, both outside the 45-day deadline to issue discipline. Supervisors ignored the 45-day deadline and upheld the suspension, going further to suspend Plaintiff permanently from patient care. Supervisors jumped on any misdeed allegedly committed by Plaintiff which Davis reported, and yet, when Plaintiff reported Davis for

24

misconduct, verbal abuse, physical intimidation, violations of the bargaining agreement or other policies, violations of HIPAA, nothing was done.

## IV. <u>AGE DISCRIMINATION</u>

In order to establish a prima facie case of age discrimination, the Plaintiff must prove the following: (1) that she was over the age of forty at the time of the adverse employment action; (2) that she was qualified for the job; (3) that she was subjected to adverse employment action; and (4) that she suffered from disparate treatment because of her membership in the protected class. <u>Apodaca v. Secretary of the Department of Homeland Security</u>, 161 Fed. Appx. 897, 900 (11th Cir. 2006); Plaintiff can satisfy her prima facie case of age discrimination. She was 48 years old at the time she was verbally abused and harassed by Harris, subjected to discipline and ultimately, terminated, despite Plaintiff's long tenure with Defendant, even serving as department head for mammography and receiving awards for her service. Instead, of investigating Plaintiff's complaints that Davis was subjecting her to differential and unfair treatment, as opposed to Plaintiff's younger coworkers, managerial employees ignored Plaintiff's complaints, and took Davis' words at face value, upholding discipline against Plaintiff and allowing Davis to escalate her abuse of Plaintiff. Then, when Davis finally forced Plaintiff from the department, Davis placed Plaintiff's younger coworker, Jennifer Newland, into Plaintiff's vacant position.

Plaintiff has shown that Defendant treated similarly-situated younger individuals more favorably.  Courts have found far less age disparities as sufficient, even where plaintiff and his replacement were both over the age of forty. See Carter v. City of Miami, 870 F.2d 578, 582-83 (11th Cir. 1989)(three years difference between plaintiff and replacement).  Davis is more than 20 years Plaintiff's junior.

Courts are even more likely to find a prima facie case of age discrimination where, in addition to younger individuals, the plaintiff has shown other evidence of age discrimination. The proper inquiry in this case is "whether an ordinary person could reasonably infer discrimination if the facts presented remained unrebutted." Carter v. City of Miami, 870 F.2d at 583 (citing Goldstein v. Manhattan Industries, Inc., 758 F.2d 1435, 1443 (11th Cir. 1985)); see also Douglas v. Anderson, 656 F.2d 528, 533 (9th Cir. 1981)(a plaintiff can satisfy his prima facie burden if replacement is only slightly younger if other circumstantial evidence supports an inference of discrimination, such as substantial evidence that he had satisfactory job performance).  Here, Plaintiff had more experience than Davis and the contract employees, including Newland, who took Plaintiff's job. Plaintiff received successful evaluations and awards, and Plaintiff even held the head of department position until Defendant made all such positions enlisted military personnel. Once Davis entered the mammography department in 2016, she began a campaign against Plaintiff until she was able to force her out.

26

Certainly, an ordinary juror could infer age discrimination where Defendant treated Plaintiff differently than the younger employees of the department who did not hold the same experience or qualifications.

## V.  <u>RETALIATION</u>

Title VII is a broad remedial measure, designed "to assure equality of employment opportunities." <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792, 800 (1973).  42 U.S.C. 2000e-3 should be interpreted broadly and the Eleventh Circuit has held that "[w]hile it is true that the language of a statute should be interpreted according to its ordinary, contemporary, and common meaning, this plain-meaning should not be applied to produce a result which is inconsistent with the policies underlying this statute." <u>Bailey v. USX Corp.</u>, 850 F.2d 1506, 1509 (11th Cir. 1988)(internal citations omitted).

To establish a prima facie case of retaliation under Title VII, a plaintiff must show that: (1) she engaged in statutorily protected expression; (2) she suffered an adverse employment action; and (3) there was some causal relationship between the two events. <u>Brochu v. City of Riviera Beach</u>, 304 F.3d 1144, 1155 (11th Cir. 2002). Defendant only challenges that Plaintiff cannot establish a causal connection between her protected activities and the discipline and other adverse employment actions to which she was subjected because final decisionmakers were not aware of Plaintiff's protected activity.

### A. **Plaintiff Engaged in Protected Speech**

Plaintiff complained multiple times within and outside of her chain of command about the treatment she was suffering by Davis. Then, when nothing was done, Plaintiff filed multiple grievances, as well as informal and formal complaints with the EEO office. However, Plaintiff's multiple complaints were to no avail.

Every complaint to Defendant's agents concerned Davis' disparate treatment of Plaintiff because of her race and age, compared to non-minority employees.

### B. **Plaintiff Suffered Adverse Retaliatory Actions**

As for prong two, "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse." Burlington N & S.F.R. Co. v. White, 548 U.S. 53, 68 (2006). The plaintiff must show that the action would dissuade a reasonable worker from making or supporting a charge of retaliation. See id.

Here, Plaintiff was subjected to harassment, verbal abuse, lowered evaluations, discipline and termination. Moreover, Davis subjected Plaintiff to an ever increasingly hostile work environment and difficult working relationship. When she attempted to report Davis' treatment, she was stonewalled. Defendant refused to even look into Plaintiff's complaints or to question her until she filed her EEO complaint. The Plaintiff has been humiliated, verbally abused, suffered deflated evaluation scores, disciplined and terminated, all in retaliation for opposing unlawful

employment practices.

**C.  Causal Connection Exists**

The causal connection is not "the sort of logical connection that would justify a prescription that the protected participation in fact prompted the adverse action" that would "rise to the level of direct evidence of discrimination." Simmons v. Camden County Bd. Of Educ., 757 F.2d 1187, 1189 (11th Cir. 1985). Rather, this Circuit "construe[s] the causal link element broadly so that 'a plaintiff merely has to prove that the protected activity and the negative employment action are not completely unrelated.'" Goldsmith v. Bagby Elevator Co., Inc., 513 F.3d 1261, 1278 (11th Cir. 2008)(quoting Olmsted v. Taco Bell Corp., 141 F.3d 1457, 1460 (11th Cir. 1998)). And, where the protected speech and adverse employment action are close in time, causation may be inferred.  See Thomas v. Cooper Lighting, Inc., 506 F.3d 1361, 1364 (11th Cir. 2007)("burden of causation can be met by showing close temporal proximity). But the bottom line is that the plaintiff must demonstrate a connection between her protected activity and adverse employment action that could "reasonably support [a] jury's determination." Olmsted v. Taco Bell Corp., 141 F.3d 1457, 1460 (11th Cir. 1998).

In this matter, Plaintiff filed complaints with Davis' supervisors that Davis treated her differently than her younger, white coworkers in April, 2016, and when nothing happened about Plaintiff's complaints, Plaintiff filed a union grievance in

May, 2016. Thereafter, Davis provided negative feedback to Plaintiff's supervisor Gladle which resulted in a seriously deficient evaluation, the first Plaintiff had received during her employment with Defendant.

Plaintiff went on to speak with the EEO office about the differential treatment and hostility she experienced from Davis in June, 2016, and to file additional union grievances, and then, Davis started issuing Plaintiff illegitimate discipline, despite not being Plaintiff's supervisor, in July, 2016. Additionally, Master Sergeant Person threatened Plaintiff with naming Davis as Plaintiff's direct supervisor. Plaintiff filed additional union grievances, and Person followed through on naming Davis as Plaintiff's supervisor in August, 2016, at which point, Davis continued to issue Plaintiff discipline for failing to use the sign in/out board, although the issue was still being grieved by the union and was not required of Plaintiff at the time Davis issued the discipline. Plaintiff filed an informal EEO complaint on August 31, 2016, and Davis began altering Plaintiff's timecards to reflect that Plaintiff was AWOL in August and September, and recommended discipline for Plaintiff relative to the prior discipline she had issued in August, 2016. Plaintiff filed a formal EEO complaint on October 21, 2016, and on October 31, 2016, Davis issued Plaintiff the second seriously deficient evaluation Plaintiff ever received. Davis failed to provide any feedback in order for Plaintiff to understand how her performance was deficient or how she could improve, contrary to Defendant's policies.

30

Thereafter, Plaintiff asked for clarification of the evaluation with no response, and again, filed a union grievance. Rather than responding to Plaintiff or to the union, Davis assigned Plaintiff to perform a stereotactic procedure by herself, and on November 15 and 18, Plaintiff continued to request clarification of her deficiencies and what job tasks she could perform. Davis continued refusing to clarify, simply repeating the order, and pursuant to Defendant's operating instruction, Plaintiff declined to perform the procedure without the requested clarification on November 18, 2016.

On December 16, 2016, Master Sergeant Thomas finally answered Plaintiff's and the union's request for clarification, stating that Plaintiff could perform all duties within her job description, and thereafter, Plaintiff complied. However, on January 4, 2017, Davis recommended Plaintiff's suspension relative to events that occurred in October, 2016, as well as the November 18, 2016 exchange. Davis' recommended discipline was outside the 45-day time limit. Davis also reported Plaintiff to the privacy officer, Humphries, for alleged HIPAA violations, although Plaintiff disputes that her emails did violate HIPAA. Plaintiff complied with Humphries' demand for a statement that she would not violate HIPAA, as well as for the required remedial training. However, Humphries determined that Plaintiff's statement was insufficient, and demanded a second statement telling Plaintiff exactly what words he wanted in the statement. Humphries' determined that Plaintiff's second statement

which was worded exactly as Humphries demanded was also deficient and sought Plaintiff's suspension from access to PHI/PII. Plaintiff amended her EEO complaint to include Davis' and Humphries' actions relative to the HIPAA allegations. Humphries never acknowledged Plaintiff's statements and never sought to reinstate her PHI/PII access.

Meanwhile, Davis' untimely suspension recommendation was upheld, Plaintiff was removed from patient care and was subjected to a quality assurance investigation.  Within less than one (1) year, Davis managed to have Plaintiff fired, and each instance occurs only a matter of weeks after Plaintiff filed formal complaints with the union and/or EEO office.  And no one bothered to investigate Plaintiff's formal complaints against Davis. Instead, supervisors concentrated on getting rid of Plaintiff.

This timeframe is well within the Eleventh Circuit's precedent for satisfying the causal connection prong. See e.g., Wideman v. Wal-Mart Stores, Inc., 141 F. 3d 1453, 1457 (11th Cir. 1998)(one month sufficient to establish nexus); Olmsted v. Taco Bell Corp., 141 F.3d 1457, 1460 (11th Cir. 1998)(four to five months sufficient for causal connection); Embry v. Callahan Eye Found. Hosp., 147 Fed.Appx. 819, 831 (11th Cir. 2005)(two months between filing charge of discrimination and suspension sufficient to satisfy nexus). A causal connection exists between Plaintiff's protected activity and the adverse actions she suffered.

32

Defendant also argues that decision-makers, including Col. Alder, Col. Smith, M.Sgt. Thomas, were unaware of Plaintiff's protected activity.

Plaintiff does not have to show management's knowledge of her protected disclosures by direct evidence. Awareness of the protected activity may also be established by producing circumstantial evidence from which a reasonable jury could infer the decision maker's knowledge. Mulhall v. Ashcroft, 287 F.3d 543, 552 (6th Cir.2002)(discussing cases). A plaintiff may produce circumstantial evidence to establish this element of his claim. See id.  And, she "need only offer circumstantial evidence that could reasonably support an inference" that supervisors making a decision not to renew Plaintiff's contract knew of his protected activity, Jones v. Bernanke, 557 F.3d 670, 679 (D.C.Cir.2009), and context matters, Burlington N & S.F.R. Co. v. White, 548 U.S. 53, 69 (2006).

Plaintiff reported Davis' harassment, retaliation and disparate treatment to supervisors, the union and the EEO office. Thereafter, Davis' supervisors took Davis' complaints of Plaintiff and recommendations for discipline at face value, and did not perform an independent investigation into Davis' recommendations. In fact, Alder testified that other supervisors personally observed Plaintiff's misconduct, and yet, every other supervisor, Ives, Person, and Super, testified that they did not personally observe Plaintiff committing any misconduct, but that all complaints originated from Davis.

33

The acts committed against Plaintiff cannot be viewed in a vacuum; looking at the big picture, Plaintiff was targeted from the time she first made her complaints until her termination. See Reeves v. C.H. Robinson Worldwide, Inc., 594 F.3d 798, 807 (11th Cir. 2010)(en banc)("workplace conduct cannot be viewed in isolation, but rather is to be viewed cumulatively, and in its social context.").

Further, the position of a biased employee within the company may raise an inference that he influenced the termination decision. See Wright v. Southland Corp., 187 F.3d 1287, 1306 n. 26 (11th Cir.1999)(noting relationship between supervisor and decisionmaker, coupled with numerous consultations between two, raised inference of cat's paw scenario). Defendant is not insulated merely because higher ranking officials and other upper management made the decision while relying on Davis' recommendations to discipline and to fire Plaintiff. The misinformation provided by Davis affected the decision to discipline and to terminate Plaintiff.

Accordingly, Plaintiff has met the third and final prong of her *prima facie* case of retaliation.

## VI. PRETEXT

In order to show pretext, Plaintiff must "demonstrate that the proffered reason was not the true reason for the employment decision… [Plaintiff] may succeed in this either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered

explanation is unworthy of credence." Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 256 (1981). In evaluating a summary judgment motion, the district court must evaluate whether the plaintiff has demonstrated "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence." Combs v. Plantation Patterns, 106 F.3d 1519, 1538 (11th Cir.1997). "[A] plaintiff withstands summary adjudication by producing sufficient evidence to allow a reasonable finder of fact to conclude that the defendant's articulated reasons for its decision are not believable." Howard v. BP Oil Co., 32 F.3d 520, 526 (11th Cir.1994) (citing St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502 (1993)); see also, Wilson v. B/E Aerospace, Inc., 376 F.3d 1079, 1088 (11th Cir. 2004)(stating plaintiff must produce "sufficient evidence to allow a rational trier of fact to disbelieve the legitimate reason proffered by the employer, which permits, but does not compel, the trier of fact to find illegal discrimination.").

Defendant claims that Plaintiff's performance and conduct were the reasons that she was disciplined and ultimately, terminated. However, as stated above, Plaintiff was subjected to different treatment that resulted in adverse employment actions, including being terminated, as a result of the Plaintiff's race and age and in retaliation for Plaintiff complaining about the harassment and abuse to which she was subjected by Davis, and then, by Humphries. See Jones v. UPS Ground Freight,

683 F.3d 1283, 1292 (11th Cir. 2012) ("We may not weigh conflicting evidence or make credibility determination of our own. If the record presents disputed issues of fact, the court may not decide them; rather, [we] must deny the motion and proceed to trial.")(citations omitted)); see also, Chapter 7 Trustee v. Gate Gourmet, Inc., 683 F.3d 1249, 1260, n.7 (11th Cir. 2012)(noting that the defendant "disputes a number of [plaintiff's] facts, but there is enough evidence to create a genuine issue for the jury as to each of them"); Morrison v. Amway Corp., 323 F.3d 920, 924 (11th Cir. 2003)("In ruling on a Rule 56 motion, the district court may not weigh the evidence or find facts. Instead, the court's role is limited to deciding whether there is sufficient evidence upon which a reasonable juror could find for the non-moving party.").

A defendant's decisions to take adverse action against the plaintiff "does not become legitimate because it can be characterized as a business decision," E.E.O.C. v. Yenkin-Majestic Paint Corp., 112 F.3d 831, 835 (6th Cir. 1997), and the fact that the action is "harsh or unreasonable" is certainly probative evidence that the asserted reason may not be the actual reason animating the employer's decision. See e.g. Wichmann v. Bd. of Trs. of S. Ill. Univ., 180 F.3d 791, 805 (7th Cir. 1999) ("[A] defendant cannot escape the fact that a jury must use its good common sense in addressing how much, if at all, the foolishness or unfairness of the employer's decision weighs in the evidence of pretext."). By granting even incredible explanations presumptive validity, the "business judgment rule" short-circuits this

36

well-settled means of proving discrimination. Here, Defendant claims that Plaintiff was derelict in her duties because she refused to sign the in/out board in the mammography department, because she was disrespectful and combative to Davis in private meetings, because she refused to perform a stereotactic procedure in November, 2016, after Davis gave her a scathing evaluation without information telling Plaintiff how her performance was deficient or how to correct the alleged deficiencies, and because she allegedly violated HIPAA by sending an encrypted email with patient information to her union representative who was assisting her with an active internal grievance.

However, Plaintiff has provided evidence that the sign in/out board was not a requirement for union employees, i.e. Plaintiff because she was the only union employee in the mammography department and the mammography department was the only one requiring employees to use such a board without fear of reprisal, until September 23, 2016, and yet, Davis reprimanded Plaintiff for failures in August, 2016 and altered Plaintiff's time cards to reflect Plaintiff as AWOL because of her failure to use the board in August and September, 2016. Plaintiff continued to inform coworkers and supervisors of her schedule through a shared electronic calendar, but Davis was insistent that she sign a board to which the union had not agreed.

Plaintiff has provided testimony that she was never disrespectful and never raised her voice to Davis during private meetings with Davis. In contrast, however,

Davis regularly followed Plaintiff around the mammography department yelling at Plaintiff in front of coworkers and patients. Plaintiff's coworkers started snickering about the behavior they observed, rather than reporting Davis to her supervisors, and when Plaintiff reported the incidents, including that Davis invaded Plaintiff's personal space, Davis suffered no repercussions, but instead, was allowed to escalate the harassment, verbal abuse and physical intimidation.

Plaintiff has provided evidence that she did not violate any rules, regulations or policies by requesting clarification of her job duties after Davis submitted the October 31, 2016 evaluation rating Plaintiff as "needs significant improvement." When Davis assigned Plaintiff to an independent stereotactic procedure scheduled for November 23, 2016, Plaintiff requested clarification of her job duties on November 15 and 18, 2016, but Davis refused to provide any information and just kept repeating the assignment. Defendant's operating instruction states that a practitioner can refuse a procedure for ethical reasons, if s/he allows notice for the procedure to be rescheduled or for another practitioner to be assigned. Plaintiff provided that notice on both November 15 and 18, 2016, but Davis ignored Plaintiff's notice. In December, 2016, Davis' evaluation was removed from Plaintiff's file and reissued, and Plaintiff was told she could perform all tasks within her job description.

On January 4, 2017, after the 45-day deadline to issue recommended

discipline, Davis recommended Plaintiff for suspension for incidents in October and November, 2016, including Plaintiff's November 18, 2016 notice that she could not perform the procedure without clear direction of her job tasks.

Thereafter, Davis reported Plaintiff for a HIPAA violation because she sent an encrypted email to her union representative who was assisting Plaintiff with an active internal grievance. Although Defendant's policy allows for patient information to be shared with a union representative in the furtherance of an internal grievance, the privacy officer demanded that Plaintiff undergo remedial training and provide a statement that she would not violate HIPAA again. Plaintiff complied with the demands. Meanwhile, Davis violated HIPAA by sending unencrypted emails with patient information and suffered no discipline for the matter. When Plaintiff amended her EEO complaint to include that Humphries subjected Plaintiff to differential treatment based on the HIPAA violations, Humphries decided that Plaintiff's statement was insufficient, sent her an order to complete a second statement with the exact wording he wanted. Again, Plaintiff complied with the order, and again, Humphries decided that the statement was insufficient.

Supervisors went on to suspend Plaintiff's access to PHI/PII and to patient care based on Davis' and Humphries' reports of Plaintiff's misconduct.

Further, where, as here, the Defendant cites violation of work rules or poor performance to justify Plaintiff's termination, the plaintiff can demonstrate that the

defense is pretextual if she submits evidence that (1) she did not engage in the work rule or particular poor performance; or (2) if she did violate the rule or engage in that poor performance, other employees outside her protected class engaged in similar acts but were treated differently. See Damon v. Fleming Supermarkets of Florida, Inc., 196 F.3d 1354, 1363 (11th Cir. 1999).

Plaintiff denies that she violated the Defendant's policies relative to the sign in/out board, the notice that she could not perform the stereotactic procedure or that she violated HIPAA in sending an encrypted email to the union. In sum, Plaintiff denies any wrongdoing.

Furthermore, another alleged reason for Plaintiff's termination involved Plaintiff's alleged treatment of Davis. However, Plaintiff reported Davis to supervisors for verbally abusing and physically intimidating her, and yet, the younger, white Davis did not receive any discipline for her conduct. In addition, Davis violated HIPAA by sending patient information in unencrypted emails, but once again, she received no discipline. Her access to information was not suspended, and she did not even have to complete remedial training, as Plaintiff did.

Plaintiff was subjected to harassment, verbal abuse, physical threats, disparate treatment from her coworkers, poor evaluations, denied pay, discipline and termination. When she complained to supervisors and management about the disparate treatment, it was not investigated, but rather was exacerbated, and

supervisors refused to reassign Plaintiff so that she was not supervised by Davis. Davis accused Plaintiff of failing to perform tasks, but refused to provide feedback, or even to sign documents requiring a signature. Davis singled Plaintiff out for verbal abuse and harassment and set Plaintiff up for failure in performing her job duties. A jury could view Defendant's attempts to mitigate the inference of discrimination through its legitimate, non-discriminatory reason as suspect. See Harris v. Warehouse Services, Inc., 77 F.Supp.2d 1240, 1249 (M.D. Ala. 1999). Plaintiff has established the inconsistent application of policies as circumstantial evidence of discrimination as well as pretext. See Berg at 1255 (11th Cir. 1998); see also, Robertson v. Jefferson County Rehabilitation and Health Center, 201 F. Supp.2d 1172, 1178 (N.D. Ala. 2002)(where employees were subject to the same disciplinary rules and the defendant repeatedly disciplined Plaintiff but not other employees for conduct that was very similar to or worse than that committed by the plaintiff, genuine issue of fact existed precluding summary judgment)

Genuine issues of fact remain as to whether Defendant's articulated non-discriminatory reasons are pretext for discrimination and retaliation.

## VII. CONCLUSION

Summary judgment should be denied on all claims, for the reasons stated above.

Respectfully submitted,


/s/  Marie A. Mattox
Marie A. Mattox [FBN 0739685]
MARIE A. MATTOX, P.A.
203 North Gadsden Street
Tallahassee, Florida 32301
(850) 383-4800 (telephone)
(850) 383-4801 (facsimile)

ATTORNEYS FOR PLAINTIFF

## CERTIFICATE OF COMPLIANCE

I hereby certify in accordance with Local Rule 7.1(F) that this response complies with the format requirements specified in Local Rule 5.1(C) and contains 9,495 words excluding headings, captions and certificates.

/s/  Marie A. Mattox
Marie A. Mattox


## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing has been furnished by CM/ECF to all counsel of record this 13th day of March, 2020.

/s/  Marie A. Mattox
Marie A. Mattox